WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Colleen Jenson,

                Plaintiff,

v.

Carolyn W. Colvin,

                Defendant.

No. CV-13-01018-PHX-BSB

**ORDER**

       Colleen Denise Jenson (Plaintiff) seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.[1]  For the following reasons, the Court affirms the Commissioner's decision.

**I.**     **Procedural Background**

       On June 21, 2010, Plaintiff applied for disability insurance benefits under Title II of the Act.  42 U.S.C. § 401-34.  (Tr. 156-62.)[2]  Plaintiff alleged that she had been disabled since November 30, 2008.  (*Id.*)  After the Social Security Administration (SSA) denied Plaintiff's initial application and her request for reconsideration, she requested a

---

[1]  The Court finds this matter suitable for resolution on the briefing and, therefore, denies Plaintiff's request for oral argument.

[2]  Citations to "Tr." are to the certified administrative transcript of record. (Doc. 16.)

1  hearing before an administrative law judge (ALJ).  After conducting a hearing, the ALJ
2  issued a decision finding Plaintiff not disabled under the Act.  (Tr. 28-38.)  This decision
3  became the final decision of the Commissioner when the Social Security Administration
4  Appeals Council denied Plaintiff's request for review.  (Tr. 1-6); *see* 20 C.F.R. § 404.981
5  (explaining the effect of a disposition by the Appeals Council.)  Plaintiff now seeks
6  judicial review of this decision pursuant to 42 U.S.C. § 405(g).

7  **II.    Medical Record**

8       The record before the Court establishes the following history of diagnosis and
9  treatment related to Plaintiff's health.  The record also includes opinions from State
10  Agency Physicians who examined Plaintiff or reviewed the records related to her health,
11  but who did not provide treatment.

12       **A.    Medical Treatment**

13       Due to her longstanding back and neck pain (Tr. 302 (reporting having back and
14  neck problems for about thirty years), Plaintiff saw a physician assistant at Arizona Pain
15  Treatment Center and received several epidural steroid injections in March and April
16  2008.  (Tr. 284-302.)  Plaintiff reported that the injections provided some relief (Tr. 297,
17  288-89, 286-87, 284-85), and that over-the-counter medications helped make her
18  symptoms tolerable.   (Tr. 302 (pain improved by "heat, activity, sitting, standing,
19  walking, OTC [over-the-counter] medications"); Tr. 284, 286-88 (pain improved by rest
20  and OTC medications).)

21       **1.    Tom Masters, D.O.**

22       On January 7, 2009, Plaintiff saw Dr. Tom Masters, D.O., for her back pain and
23  "possible fibromyalgia."  (Tr. 305-08.)  Dr. Masters noted tenderness in facet areas T11-
24  T-12, tenderness in facet areas L4 and L5, and noted decreased range of motion on
25  extension. (Tr. 305.)  He recommended lumbar facet injections and stretching.  (Tr. 306.)
26  On April 3, 2009, Dr. Masters noted moderate tenderness at L2 through S1 and at the
27  sacroiliac notches.  (Tr. 307.)  He assessed chronic law back pain and fibromyalgia.  (*Id.*)
28  During that visit, Dr. Masters administered lumbar facet injections at L4, L5, and S1

1  levels.   (*Id.*)   He noted moderate tenderness and some decreased range of motion.
2  (Tr. 305-08.)

3  ### 2.   Trent Smith, M.D.

4  On September 4, 2009, Plaintiff saw Dr. Trent Smith, M.D.  (Tr. 345.)  Plaintiff
5  complained of fatigue, headaches, neck pain and stiffness, joint pain, back pain, and "soft
6  tissue stiffness."  (*Id.*)  Plaintiff reported that she had had pain "throughout most of her
7  life."  (*Id.*)  Plaintiff reported occasionally using Aleve "with benefit."  (*Id.*)  Dr. Smith
8  assessed osteoarthritis of the hand and fibromyalgia trigger point tenderness (18/18).
9  (Tr. 347.)  He prescribed Gabapentin for Plaintiff's fibromyalgia and recommended a
10 follow-up visit in one month.  (Tr. 348.)

11 During a follow-up appointment in late September 2009, Plaintiff complained of
12 fibromyalgia and again reported that she had had pain "throughout most of her life."  (*Id.*)
13 Dr. Smith found tenderness at eighteen of eighteen fibromyalgia trigger points and
14 assessed fibromyalgia, fatigue, and oseteoarthritis of the hand.  (Tr. 344.)  Because
15 Plaintiff reported being intolerant to most prescription medication, including Gabapentin,
16 Dr. Smith discussed "complementary therapy options like manipulation and the helen
17 foundation (homeopathic cortisol) doses."  (Tr. 344.)  He recommended a follow-up visit
18 in one year.  (*Id.*)

19 ### 3.   Angela Sturdivant, M.D.

20 On December 17, 2009, Plaintiff saw Dr. Angela Sturdivant, M.D., at Southwest
21 Family Practice for a "wellness exam."  (Tr. 432-33.)  Dr. Sturdivant noted that Plaintiff
22 had fibromyalgia.  (Tr. 433.)  Dr. Sturdivant next saw Plaintiff on March 9, 2010.
23 (Tr. 428.)  Plaintiff's chief complaints were neck pain, back pain, and acid reflux.
24 (Tr. 428.)  She reported having had neck and back pain "for years."  (*Id.*)  Plaintiff
25 reported pain with standing.  (Tr. 429.)  On examination, Dr. Sturdivant noted back pain,
26 tender L5 and cervical area, "normal tone and mass,"  and "deferred" examination on
27 Plaintiff's eyes, "HENT," "lymphatic," "GI," "neuro" and "psych."  (Tr. 429-30.)  She
28 referred Plaintiff to West Valley Pain Management.  (Tr. 431.)

Dr. Sturdivant next saw Plaintiff on June 3, 2010.  (Tr. 424.)  Plaintiff's chief complaints were "medication consult/lump behind knee/thyroid/toe itching."  (*Id.*)  Plaintiff was "concerned about Prilosec with bone loss.  It helps her heart burn."  (*Id.*)  Plaintiff reported increased fatigue.  (Tr. 425.)  She also reported receiving physical therapy for fibromyalgia and indicated that "massage therapy, physical therapy, and stretching had minimally improved her symptoms."  (*Id.*)  Dr. Sturdivant deferred examination on "eyes," "HENT," "lymphatic," "GI," "GU," "Neuro," and "Psych." (Tr. 425-26.)  She assessed "menopausal disorder unspecified," "popliteal synovial cyst," "fatigue and/or malaise," fibromyalgia, and "toe anomaly."  (Tr. 426.)  She recommended an x-ray of Plaintiff's toe, "increased stretches," and "soy, evening primrose and black cohash."  (*Id.*)

During an August 2010 visit with Dr. Sturdivant, Plaintiff complained of increased fibromyalgia pain over the previous three weeks, and reported that she was taking Aleve. (Tr. 472.)  Plaintiff reported back pain and fatigue.  (Tr. 473.)  On examination, Dr. Sturdivant noted that Plaintiff was "alert and cooperative without acute distress." (*Id.*)  Dr. Sturdivant assessed fibromyalgia.  (*Id.*)

Dr. Sturdivant saw Plaintiff on November 10, 2010 to complete "disability forms." (Tr. 465.)  Plaintiff reported "chronic pain, right UE [upper extremities] worse pain and numbness."  (*Id.*)  Dr. Sturdivant completed two progress notes on November 10, 2010. In the first note, Dr. Sturdivant states that she completed the disability forms "by interviewing patient."  (Tr. 466.)  The second progress note reflects that, on examination, Dr. Sturdivant found "no joint pain, stiffness, swelling or redness," "no muscle weakness or cramping," "no gait disturbance, dizziness, or syncope," and "no fatigue," "no joint/muscle tenderness," and full range of motion of all joints.  (Tr. 469-70.)  Dr. Sturdivant continued seeing Plaintiff in 2011.  She renewed a prescription for therapeutic massage for Plaintiff's fibromyalgia.  (Tr. 556-63 (February 2011), Tr. 545-55 (March 2011), Tr. 541-43 (April 2011).)

### 4.      September 2009 MRIs and 2011 CT Scan

In September 2009, Plaintiff was referred for a cervical spine MRI.  (Tr. 499.)  The "[f]indings" from the MRI indicated degenerative disk disease and "bony hypertrophic changes" at C3-C4 and C6-C7.  (Tr. 500.)  The findings also included "mild bony narrowing" of the right and left neuroforamina at C3-C4 and C4-C5, mild to moderate bony narrowing of the left and right neuroforamina at C5-C6, and moderate bony narrowing of both neuroforamina at C6-C7.  (*Id.*)

In September 2009, Plaintiff was also referred for a lumbar spine MRI.  (Tr. 501.)  The MRI "impressions" noted degenerative disk disease, appearing most advanced at L5-S1.  (Tr. 502.)  The MRI also revealed lumbar minimal broad-based disk bulge at L2-L3, mild canal stenosis at L4-L5, broad-based disk bulge at L5-S1 and facet arthrosis with mild bony narrowing of both neuroforamina.  (*Id.*)

A CT scan of Plaintiff's neck on March 4, 2011 revealed, "[m]oderately severe hypertrophic disc desiccation at the C5-6 and C6-7 levels with reversal of the normal lordotic curvature compatible with muscle spasm."  (Tr. 518.)  The CT scan also revealed "[p]osterolateral osteophyte formation at each of these levels contributing to moderate to moderately severe bilateral neural foraminal narrowing, and disc protrusions at the C5-6 and C6-7 levels."  (Tr. 518.)

### 5.      Navtej Tung, M.D. and James Hawkins, M.D.

Plaintiff saw Dr. Navtej Tung, M.D., at West Valley Pain Management on June 30, 2010 for chronic back and neck pain, which she reported having since the 1970's.  (Tr. 439.)  She reported neck and back pain, neck and back stiffness, and decreased range of motion.  (*Id.*)  She described her symptoms as "unchanged."  (*Id.*)  Plaintiff stated that her pain improved with over-the-counter medication and with ice and massage.  (*Id.*)

On October 22, 2010, Plaintiff saw Dr. James Hawkins, M.D., at Arizona Spine Care complaining of back, neck, and hip pain.  (Tr. 459.)  Plaintiff reported that she "had a history of fibromyalgia since her twenties."  (*Id.*)  Plaintiff reported that she had had epidural injections two years earlier that provided relief.  (*Id.*)  Dr. Hawkins found that

1   Plaintiff's range of motion was sixty percent of normal, that she had normal motor
2   strength, normal sensation, and some spine tenderness.  (Tr. 459-60.)  Dr. Hawkins also
3   reviewed the reports from Plaintiff's September 18, 2009 MRIs of her cervical and
4   lumbar spine.  (Tr. 462.)  Dr. Hawkins diagnosed lumbago and tendinitis of the hip and
5   referred Plaintiff for x-rays and to Valley Pain Specialists for an epidural injection.  (*Id.*)
6   X-rays of Plaintiff's hips in October 2010 showed mild osteoarthritis.  (Tr. 457.)  An x-
7   ray of Plaintiff's lumbar spine showed decreased disc height at L5-S1 and mild
8   degenerative disc disease and facet disease most pronounced at L5-S1.  (Tr. 458.)

9   **6.    Allan Rowley, M.D. and Ellen Olson, M.D.**

10   On July 8, 2011, Plaintiff saw Dr. Allan Rowley, M.D., at the Spine Institute of
11   Arizona.  (Tr. 578.)  Plaintiff reported low and mid-back pain, neck pain, right leg pain,
12   and bilateral arm pain.  (*Id.*)  Plaintiff reported having fibromyalgia "since she was a
13   teenager."  (Tr. 579.)  Plaintiff reported that epidural steroid injections "three to four
14   years ago" provided "four to five months of good relief of her pain."  (*Id.*)  She also
15   reported that her pain was constant and "worsened over time."  (*Id.*)  Plaintiff stated that
16   her pain was "exacerbated by walking, sitting, standing, lying down, kneeling, typing,
17   bending, twisting, lifting, carrying, pushing, pulling and working overhead."  (*Id.*)
18   Plaintiff further stated that her pain was reduced with "frequent changes in position,
19   stretching, massage, and or cold packs."  (*Id.*)  Dr. Rowley diagnosed fibromyalgia and
20   multi-level spinal disc degeneration.  (Tr. 578-82.)  He recommended a home exercise
21   program and additional epidural steroid injections.  (*Id.*)

22   On September 19, 2011, on referral from Dr. Hawkins, Plaintiff saw Dr. Ellen
23   Olson, M.D., at Valley Pain Consultants regarding her back, hip, and neck pain.
24   (Tr. 573.)   Plaintiff reported that she had experienced pain for thirty years that was
25   aggravated by "activity, prolonged sitting [and] prolonged standing," and was alleviated
26   by "heat [and] lying down."  (*Id.*)  Dr. Olson noted that Plaintiff had chronic pain and
27   fibromyalgia. (Tr. 575.)  Dr. Olson recommended epidural steroid injections and referred
28   Plaintiff for a bilateral EMG.  (*Id.*)

1    **B.    Medical Opinion Evidence**

2        **1.    State Agency Physicians' Opinions**

3        In August 2010, as part of the initial disability determination, David G. Jarmon,

4    Ph.D., conducted a psychiatric evaluation of Plaintiff.  (Tr. 443.)  He opined that Plaintiff

5    did not have a "significant psychological disturbance."  (Tr. 446.)  In October 2010,

6    Vivienne J. Kattapong, M.D., a state agency physician, reviewed the medical record and

7    opined there was insufficient evidence to assess Plaintiff's physical limitations.  (Tr. 84.)

8    She explained that "to help evaluate [Plaintiff's] disability claim, [the Agency] had

9    scheduled a consultative exam at [the Agency's] expense.  (Tr. 87.)  Plaintiff "stated that

10   she would not attend [that] appointment and that [she] wanted a decision based on the

11   medical evidence in [the] file." (*Id.*)  Dr. Kattapong determined that the record, without a

12   consultative examination, contained insufficient evidence to determine the severity of

13   Plaintiff's physical conditions, and she recommended that Plaintiff's claim for disability

14   benefits be denied.  (*Id.*)

15       Plaintiff requested reconsideration and submitted additional medical records in

16   support of her claim.  (Tr. 90-91.)  Plaintiff again wanted to rely only on the medical

17   record for the disability determination and refused a consultative examination.  (Tr. 94,

18   95.)  As part of the reconsideration process, in January 2011, state agency physician

19   Ernest Griffith, M.D., completed an assessment form concluding that Plaintiff could

20   perform light work with some postural and environmental limitations.   (Tr. 97-99.)

21   Dr. Griffith opined that Plaintiff could stand or walk for about six hours in an eight-hour

22   workday, sit for more than six hours in an eight-hour workday, occasionally lift twenty

23   pounds and frequently ten pounds, frequently climb ramps or stairs, frequently balance

24   and kneel, occasionally climb ladders, ropes, or scaffolds, crouch, stoop, or crawl, and

25   frequently reach overhead.  (Tr. 97-99.)  He also opined that Plaintiff should avoid

26   concentrated exposure to hazards.  (Tr. 99.)

27   / / /

28   / / /

### 2.    Dr. Sturdivant's Opinions

In November 2010 treating physician Dr. Sturdivant completed a Fibromyalgia Residual Functional Capacity (RFC) Questionnaire and a Pain RFC Questionnaire. (Tr. 475-477, 478-79.)  Dr. Sturdivant found that Plaintiff's pain and fatigue and other symptoms prevented her from sustaining work activity on a regular and continuing basis. (Tr. 477.)  Dr. Sturdivant completed a Fatigue RFC Questionnaire in September 2011. (Tr. 497.)  She opined that Plaintiff's moderately severe fatigue "seriously affected her ability to function," and would frequently interfere with her "concentration, persistence, or pace."  (Tr. 497.)  She also noted that Plaintiff needed to nap once or twice a day and opined that Plaintiff could not sustain work on a regular and continuing basis.  (Tr. 497.)

## III.    Administrative Hearing Testimony

Plaintiff was fifty-five years old at the time of the administrative hearing in October 2011, and had a high school education.  (Tr. 56-57.)  Her past relevant work included hostess and clerical worker.  (Tr. 50-51.)  Plaintiff testified that she stopped working as a hostess in 2008 because she was laid off.  (Tr. 60.)  She also testified that around the time she was laid off, she was "having a lot of trouble standing" at work, and that " her "sciatic pain was bothering [her] and causing pain into [her] feet," and she "was having an awful lot of pain [in her] neck and arms and lower back . . . ."  (Tr. 60-61.)

Plaintiff testified that she had been diagnosed with fibromyalgia "for a while" and that she had had neck or back pain since she was eight or nine years old.  (Tr. 61, 64.)  She stated that she suffered generalized pain due to fibromyalgia, and that her fibromyalgia and her degenerative disk disease caused neck pain that radiated into her arms, hands, and feet, and low back pain that radiated into her legs.  (Tr. 61.)  She also testified that she had headaches, memory and concentration problems, trouble sleeping, and fatigue which caused her to lie down periodically throughout the day.  (Tr. 63, 65.)  Plaintiff stated that she could sit or stand for about ten to twenty minutes before she started "fidgeting" due to pain.  (Tr. 67.)  She also testified that she could walk one-half to three-quarters of a mile, and that she could lift or carry up to seven pounds.  (*Id.*)

1    Vocational expert David Janus also testified at the administrative hearing.  The
2    ALJ asked the vocational expert whether a hypothetical individual with the limitations
3    assessed by Dr. Griffith could perform work.  (Tr. 70.)  The vocational expert testified
4    that such an individual could perform Plaintiff's past work as a hostess and clerical
5    worker.  (Tr. 71.)  However, the vocational expert testified that a person with the
6    limitations Dr. Sturdivant assessed would be unable to sustain any work.  (Tr. 73-75.)

7  **IV.    The ALJ's Decision**

8    A claimant is considered disabled under the Social Security Act if she is unable
9    "to engage in any substantial gainful activity by reason of any medically determinable
10    physical or mental impairment which can be expected to result in death or which has
11    lasted or can be expected to last for a continuous period of not less than 12 months."
12    42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard
13    for supplemental security income disability insurance benefits).  To determine whether a
14    claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See*
15    20 C.F.R. §§ 404.1520, 416.920.

16      **A.      Five-Step Evaluation Process**

17    In the first two steps, a claimant seeking disability benefits must initially
18    demonstrate (1) that she is not presently engaged in a substantial gainful activity, and
19    (2) that her disability is severe.  20 C.F.R. § 404.1520(a)(4)(i) and (ii).  If a claimant
20    meets steps one and two, she may be found disabled in two ways at steps three through
21    five.  At step three, she may prove that her impairment or combination of impairments
22    meets or equals an impairment in the Listing of Impairments found in Appendix 1 to
23    Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is
24    presumptively disabled.  If not, the ALJ determines the claimant's residual functional
25    capacity (RFC).  20 C.F.R. § 404.1520(e).  At step four, the ALJ determines whether a
26    claimant's    RFC    precludes    her    from    performing    her    past    work.
27    20 C.F.R. §  404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the
28    burden shifts to the government at step five to establish that the claimant can perform

1    other jobs that exist in significant number in the national economy, considering the

2    claimant's RFC, age, work experience, and education.  20 C.F.R. § 1520(a)(4)(v).  If the

3    government does not meet this burden, then the claimant is considered disabled within

4    the meaning of the Act.

5          **B.      The ALJ's Application of Five-Step Evaluation Process**

6          Applying the five-step sequential evaluation process, the ALJ found that Plaintiff

7    had not engaged in substantial gainful activity since November 30, 2008, the alleged

8    disability onset date.  (Tr. 30.)  At step two, the ALJ found that Plaintiff had the

9    following severe impairments: "fibromyalgia; degenerative disc disease; mild

10   osteoarthritis of the bilaterial hips and cervical [spine]."  (*Id.*)  At the third step, the ALJ

11   found that the severity of those impairments did not meet or medically equal the criteria

12   of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 32.)  The ALJ

13   next concluded that Plaintiff retained the RFC "to perform less than the full range of light

14   work as defined in 20 C.F.R.§ 404.1567(b) except [the claimant is limited to] occasional

15   climbing of ladders, ropes, and scaffolds; occasional stooping, crouching, [and]

16   crawling."  (*Id.*)  The ALJ further found that Plaintiff could perform "frequent climbing

17   [of] ramps and stairs; kneeling, balancing; [and] frequent overhead reaching bilaterally,"

18   and that she "should avoid concentrated exposure to irritants, such as odors, fumes, dusts,

19   and gases; and should avoid concentrated exposure to moving machinery and unprotected

20   heights."  (*Id.*)  At step four, the ALJ found that Plaintiff could perform her "past relevant

21   work, classified by the vocational expert as a: hostess, light semi-skilled work . . . ; and a

22   clerical worker, light semi-skilled [work]."[3]  (Tr. 38.)  The ALJ concluded that Plaintiff

23   was not disabled within the meaning of the Act.  (*Id.*)

24   **V.      Standard of Review**

25         The district court has the "power to enter, upon the pleadings and transcript of

26   record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

27   _____

28       [3]  *See* 20 C.F.R. § 404.1567 (defining exertional levels of work), and 20 C.F.R. § 404.1568 (defining skill levels of work).

1    with or without remanding the cause for a rehearing."   42 U.S.C. § 405(g).   The district

2    court reviews the Commissioner's final decision under the substantial evidence standard

3    and must affirm the Commissioner's decision if it is supported by substantial evidence

4    and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

5    (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).   Even if the ALJ

6    erred, however, "[a] decision of the ALJ will not be reversed for errors that are

7    harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

8           Substantial evidence means more than a mere scintilla, but less than a

9    preponderance; it is "such relevant evidence as a reasonable mind might accept as

10   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

11   (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).   In

12   determining whether substantial evidence supports a decision, the court considers the

13   record as a whole and "may not affirm simply by isolating a specific quantum of

14   supporting evidence."   *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

15   quotation and citation omitted).

16          The ALJ is responsible for resolving conflicts in testimony, determining

17   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

18   Cir. 1995).   "When the evidence before the ALJ is subject to more than one rational

19   interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.

20   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

21   **VI.    Plaintiff Claims the ALJ Erred in Discounting her Subjective Complaints**

22          **A.    Assessing a Claimant's Credibility**

23          Plaintiff argues that the ALJ erred in discounting her subjective complaints.   An

24   ALJ engages in a two-step analysis to determine whether a claimant's testimony

25   regarding subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028,

26   1035-36 (9th Cir. 2007).   "First, the ALJ must determine whether the claimant has

27   presented objective medical evidence of an underlying impairment 'which could

28

1    reasonably be expected to produce the pain or other symptoms alleged.'"   *Id*. at 1036

2    (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

3            The claimant is not required to show objective medical evidence of the pain itself

4    or of a causal relationship between the impairment and the symptom.   *Smolen*, 80 F.3d at

5    1282.   Instead, the claimant must only show that an objectively verifiable impairment

6    "could reasonably be expected" to produce her pain.   *Lingenfelter*, 504 F.3d at 1036

7    (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d

8    1155, 1160-61 (9th Cir. 2008) ("requiring that the medical impairment could reasonably

9    be expected to produce pain or another symptom . . . requires only that the causal

10   relationship be a reasonable inference, not a medically proven phenomenon").   It is

11   undisputed that Plaintiff presented evidence of an impairment that could produce the

12   alleged symptoms.

13           Second, if a claimant produces medical evidence of an underlying impairment that

14   is reasonably expected to produce some degree of the symptoms alleged, and there is no

15   affirmative evidence of malingering, an ALJ must provide "clear and convincing

16   reasons" for an adverse credibility determination.   *See Smolen*, 80 F.3d at 1281; *Gregor*

17   *v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).   When evaluating a claimant's credibility,

18   the ALJ may consider the objective medical evidence, the claimant's daily activities, the

19   location, duration, frequency, and intensity of the claimant's pain or other symptoms,

20   precipitating and aggravating factors, medication taken, and treatments for relief of pain

21   or other symptoms.   *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

22           An ALJ may also consider such factors as a claimant's inconsistent statements

23   concerning symptoms and other statements that appear less than candid, the claimant's

24   reputation for lying, unexplained or inadequately explained failure to seek treatment or

25   follow a prescribed course of treatment, medical evidence tending to discount the severity

26   of the claimant's subjective claims, and vague testimony as to the alleged disability and

27   symptoms.   *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Smolen*, 80

28   F.3d at 1284.   If substantial evidence supports the ALJ's credibility determination, that

1  determination must be upheld, even if some of the reasons cited by the ALJ are not

2  correct.  *Carmickle*, 533 F.3d at 1162.

3  **B.  The ALJ's Credibility Determination**

4  Because there was no evidence of malingering, the ALJ was required to provide

5  clear and convincing reasons for concluding that Plaintiff's subjective complaints were

6  not wholly credible.  (Tr. 33.)  Plaintiff argues that the ALJ failed to do so.  (Doc. 21 at

7  24-33.)  As discussed below, the ALJ listed several factors in support of his credibility

8  determination, including that: (1) Plaintiff was not forced to stop working due to her

9  impairments, but was laid off for other reasons and continued seeking employment after

10  the disability onset date; (2) Plaintiff received unemployment benefits; (3) treatment was

11  "generally successful" in controlling her symptoms; (4) Plaintiff's "daily activities [were]

12  not limited to the extent one would expect, given the complaints of disabling symptoms

13  and limitations"; (5) the objective medical evidence was inconsistent with Plaintiff's

14  allegations of disabling pain and fatigue; and (6) Plaintiff "refused to participate with a

15  state-agency requested physical examination to further assess her physical

16  allegations/limitations."  (Tr. 35.)  Although the Court does not uphold all of these

17  reasons for discounting Plaintiff's credibility, the Court affirms the ALJ's credibility

18  determination because he provided sufficient legally adequate reasons in support of that

19  determination.  *See Batson*, 359 F.3d at 1197 (stating that the court may affirm an ALJ's

20  overall credibility conclusion even when not all of the ALJ's reasons are upheld).

21  **1.  Circular Reasoning**

22  In his assessment of Plaintiff's credibility, the ALJ stated that Plaintiff's

23  "medically determinable impairments could reasonably be expected to cause the alleged

24  symptoms; however, the claimant's statements concerning the intensity, persistence and

25  limiting effects of those symptoms are not credible to the extent they are inconsistent

26  with the above residual functional capacity assessment."  (Tr. 33.)  Plaintiff argues that

27  this statement is improper circular reasoning because the ALJ was supposed to take into

28  account the limiting effects of Plaintiff's symptoms in formulating his RFC, not

determine Plaintiff's RFC and then reject any symptom testimony that was not consistent with that RFC.  (Doc. 21 at 25); *see Leitheiser v. Astrue*, 2012 WL 967647 at *9 (D. Or. Mar. 16, 2012) ("Dismissing a claimant's credibility because it is inconsistent with a conclusion that must itself address the claimant's credibility is circular reasoning and is not sustained by this court.").

Although the ALJ's statement could be considered improper circular reasoning if considered in isolation, the record reflects that the ALJ also explained why he found Plaintiff's allegations of disabling symptoms not entirely credible.  (Tr. 33-35.)  The ALJ's challenged statement appears to be a summary, rather than an unsupported conclusion.  Moreover, even if the ALJ erred in relying on circular reasoning to discredit Plaintiff's credibility, any error was harmless because, as discussed below, he provided other clear and convincing reasons for discrediting Plaintiff's subjective complaints.

### 2.    Plaintiff's Work History

In support of his adverse credibility determination, the ALJ noted that Plaintiff's primary medical conditions (fibromyalgia, back pain, and neck pain) had existed for many years while she was working, that she stopped working because she was laid off, not for health reasons, and that she continued looking for work after the disability onset date.  (Tr. 33.)

Substantial evidence in the record indicates that Plaintiff had a long history of fibromyalgia, and neck and back pain.  (Tr. 302, 305, 342, 428-20, 439-40, 459, 573-76, 578-82.)  Plaintiff reported to medical providers that she had experienced pain related to fibromyalgia "throughout most of her life" that began when she was a "teenager" or when she was in her twenties.  (Tr. 345, 459, 579.)  She also reported that she had experienced chronic neck and back pain since the 1970's.  (Tr. 439, 573.)  During the administrative hearing, Plaintiff confirmed that, although she was experiencing pain-related "problems" standing and lifting at the time of her layoff, she "left the employment . . . due to the layoff."  (Tr. 60.)  Additionally, as part of her disability application, Plaintiff informed a state agency physician that she was laid off in November 2008 due to a decrease in

business.   (Tr. 444.)   A work history report that Plaintiff completed as part of her application for disability benefits confirms that Plaintiff last worked in November 2008. (Tr. 192.)  Plaintiff's alleged disability onset date is November 30, 2008.

An ALJ may reasonably draw an adverse inference from evidence that a claimant stopped working for reasons other than her allegedly disabling medical condition.  *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (ALJ did not err in discounting the claimant's credibility when he stopped work due to a layoff and the alleged disability onset date was the same date as the layoff); *Dmitrieva v. Colvin*, 2013 WL 2903038, at *5 (E.D. Wash. Jun. 13, 2013) (ALJ properly discounted the claimant's credibility based on his testimony that he quit his last job, in part, due to dissatisfaction with long hours); *Gladden v. Colvin*, 2013 WL 5467371, at *8 (C.D. Cal. Sept. 30, 2013 (finding that the fact that the claimant had stopped working because she was laid off was a clear and convincing reason for finding her not credible).  Here, the ALJ did not err in discounting Plaintiff's credibility based on evidence that, although her medical conditions had existed for many years while she was working, she stopped working in 2008 due to a layoff.  *See Bruton*, 268 F.3d at 828; *Gregory v. Bowen*, 844 F.2d 664, 667 (9th Cir. 1988) (affirming finding that the claimant's back problems were not disabling when that impairment had remained constant for a number of years and had not prevented her from working).

The ALJ also noted that Plaintiff sought work after the alleged disability onset date.  (Tr. 34.)  Plaintiff's testimony confirms that she applied for clerical jobs as late as 2009 or 2010.  (Tr. 60.)  The ALJ properly concluded that Plaintiff's continued search for employment detracted from her credibility.  *See Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009) (the fact that a claimant has sought out employment weighs against a finding of disability).

### 3.    Receipt of Unemployment Benefits

The ALJ also discounted Plaintiff's subjective complaints because she collected unemployment benefits after November 30, 2008, and explained that the receipt of such benefits undermined Plaintiff's credibility because those benefits are based upon a

1   recipient's assertion that she can work, which contradicted Plaintiff's application for
2   disability benefits. (Tr. 34.) The ALJ also noted that during the administrative hearing,
3   Plaintiff testified that she had applied for and received unemployment benefits and that to
4   receive those benefits, she held herself out as ready, willing, and able to work. (*Id.*)

5        The receipt of unemployment benefits may undermine a claimant's alleged
6   inability to work full time. *Carmickle*, 533 F.3d at 1162 (citing *Copeland v. Bowen*, 861
7   F.2d 536, 542 (9th Cir. 1988)). This is because unemployment benefit applications may
8   require that a claimant hold herself out as available for full time work. *Copeland*, 861
9   F.2d at 542. Plaintiff's unemployment benefits application is not in the record before this
10  Court. During the administrative hearing, Plaintiff agreed that she indicated in the
11  unemployment benefits application that she was "ready, willing, and able to work."
12  (Tr. 59.) However, she did not state whether she held herself out as available for part-
13  time or full-time work. (*Id.*)

14       The record before the Court does not establish whether Plaintiff held herself out as
15  available for full-time or part-time work. Because the Court cannot determine whether
16  Plaintiff made an assertion regarding her availability for full-time work, her application
17  for and receipt of unemployment benefits does not constitute a clear and convincing
18  reason for discrediting Plaintiff's credibility. *See Carmickle*, 533 F.3d at 1162 (finding
19  that holding oneself out as able to perform full-time, as opposed to part-time, work "is
20  inconsistent with [a claimant's] disability allegations"); *Ellis v Astrue*, 2011 WL
21  5025839, at *6 (D. Or. Oct. 20, 2011) (finding that ALJ erred in discounting the
22  claimant's subjective complaints based on his receipt of unemployment benefits when the
23  record did not include the unemployment benefits application and thus the record did not
24  establish the "manner in which [the claimant] held himself available for work.").

25                    **4.    The Effectiveness of Treatment**

26       In further support of his adverse credibility determination, the ALJ found that
27  medication and other treatment effectively controlled Plaintiff's symptoms. (Tr. 34.) In
28  assessing a claimant's credibility about her symptoms, the ALJ may consider "the type,

dosage, effectiveness, and side effects of any medication."   20 C.F.R. § 404.1529(c).

Evidence that treatment can effectively control a claimant's symptoms may be a clear and

convincing reason to find a claimant less credible.  *See* 20 C.F.R. §§ 404.1529(c)(3)(iv),

§ 416.929(c)(3)(iv); *Warre v. Comm'r, of Soc. Sec. Admin*., 439 F.3d 1001, 1006 (9th Cir.

2006) (stating that "[i]mpairments that can be controlled effectively with medication are

not disabling for purposes of determining eligibility for SSI benefits.").

The record indicates that Plaintiff reported receiving pain relief from ice, rest,

heat, and massage (Tr.  284, 286, 288, 293, 302, 439, 573), that she had "fair symptom

control" with non-steroidal anti-inflammatories (Tr. 439,   573),   that   a   home

exercise/stretching program and anti-inflammatories helped "keep her symptoms

tolerable" (Tr. 284, 286), and that she had relief from epidural injections.  (Tr. 284-85,

286-87, 288-89, 459, 505, 573, 581.)  Although treatment notes also indicate that Plaintiff

had chronic or constant pain (Tr. 465, 472, 573, 579), that medication did not always

alleviate her pain (Tr. 293), or that her pain was only "minimally improved by "massage

therapy, physical therapy, and stretching" (Tr. 425), because the ALJ is responsible for

resolving conflicts in the medical record, the ALJ did not err in concluding that the record

reflected that treatment effectively controlled Plaintiff's symptoms and for discounting

her credibility on that basis.  *See Carmickle,*  533 F.3d at 1164 ("The ALJ is responsible

for resolving conflicts in the medical record"); *Tommasetti v. Astrue*, 533 F.3d 1035,

1040 (9th Cir. 2008) (an ALJ may infer that a claimant's "response to conservative

treatment undermines [claimant's] reports regarding the disabling nature of his pain").

### 5.    Plaintiff's Activities

In further support of his credibility determination, the ALJ found that Plaintiff's

reported daily activities were inconsistent with her alleged disabling symptoms.  (Tr. 34.)

The ALJ noted that Plaintiff is independent with her daily care and hygiene, prepares

"quick, simple meals, and [helps] with household chores such as folding laundry and

daily light housework."  (*Id.* at 31.)  He further noted that Plaintiff "drives, goes grocery

shopping approximately one to two times a week, manages her finances, . . pays

bills . . . read[s], watch[es] television, watch[es] sports events, listen[s] to music, and conver[es] with friends on the phone and computer." (*Id.*)  The ALJ also noted that the "medical evidence reports multiple times that [Plaintiff] is independent with daily activities which is not consistent with [Plaintiff's] allegations." (Tr. 34.)  The ALJ also found it significant that, on a third-party function report, Plaintiff's spouse indicated that she was capable of performing light household cleaning and "'tries to do as much as possible.'" (Tr. 34 (quoting Admin. Hrg. Ex. 6E).)  Although the ALJ noted that Plaintiff's ability to perform some normal daily activities did not establish that she could perform competitive work on a sustained basis, he found that Plaintiff's activities and her ability "to spend a substantial part of the day in those activities," suggested that she had "the ability to sustain some level of activity, if motivated to do so" and that she had "greater physical and mental capacities than she has stated in the testimony and written statements." (Tr. 34-35.)

The Ninth Circuit has held that a claimant's participation in normal daily activities "does not in any way detract from [her] credibility as to [her] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  The Ninth Circuit continued, "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  Rather, the daily activities must involve skills that could be transferrable to a workplace and a claimant must spend a "substantial part of his day" engaged in those activities.  *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (finding that the ALJ reasonably concluded that the claimant's activities, including walking her grandchildren to and from school, attending church, shopping, and taking walks undermined her claims that she was incapable of being around people without suffering panic attacks and involved a degree of human interaction that was analogous to that required by her past work); *Webber v. Astrue*, 305 Fed. App'x 311, 315 (9th Cir. 2008) (affirming adverse credibility determination when the claimant performed many household activities and the ALJ concluded that the capacities to perform those tasks "replicat[ed] those necessary for obtaining and maintaining

employment."); *Orn*, 495 F.3d at 639 (finding that the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations.").

Here, although the ALJ found that Plaintiff spent "a substantial part of the day in activities involving the performance of functions," he did not indicate that those activities involved capacities that were transferrable to a work setting.   (Tr. 35.)   Plaintiff's activities included light housework, driving, grocery shopping, paying bills, watching television, reading, and socializing on the phone or the computer.   (Tr. 31, 34.)   The Ninth Circuit has opined that, "[d]aily household chores and grocery shopping are not activities that are easily transferable to a work environment."   *Blau v. Astrue*, 263 Fed. App'x. 635, 637 (9th Cir. 2008); *Fair,* 885 F.2d at 603 (daily household chores and grocery shopping are not easily transferrable to a work environment "where it might be impossible to periodically rest or take medication.").

Additionally, Plaintiff's other activities do not provide a clear and convincing reason for discounting her subjective complaints.   *See Edler v. Astrue*, 391 Fed. App'x 599, 601 (9th Cir. 2010) (the claimant's "single camping trip," participation in a seasonal hunting trip with "considerable help," ability to check e-mail, play computer games, play guitar, watch television, and visit a friend weekly "did not evidence physical abilities transferrable to a work settings, as is required for daily activities that may discredit a claimant's subjective testimony.").   Accordingly, Plaintiff's daily activities did not provide a clear and convincing reason to support the ALJ's adverse credibility determination.

### 6.    Plaintiff's Lack of Cooperation

The ALJ also discounted Plaintiff's credibility because she "refused to participate in a state-agency requested physical examination to further assess her physical allegations/limitations, and requested medical records be reviewed to evaluate her claims."   (Tr. 36.)   To facilitate the Agency's evaluation of Plaintiff's application for disability benefits, it requested that Plaintiff participate in a consultative physical

1    examination with an agency physician and scheduled an appointment at the Agency's
2    expense.  (Tr. 82, 87.)  Plaintiff requested that the Agency cancel the appointment and
3    make its determination based on the existing medical record.  (Tr. 87, 94-95, 233.)

4           The ALJ properly considered Plaintiff's failure to cooperate with the state
5    agency's request that she undergo a physical examination with a state-agency physician
6    in support of his adverse credibility determination.  *See Thomas v. Barnhart*, 278 F.3d
7    947, 959 (9th Cir. 2002) (an ALJ may rely on lack of cooperation or poor effort during
8    examinations to discount a claimant's credibility); *Tonapetyan v. Halter*, 242 F.3d 1144,
9    1148 (9th Cir. 2001) (an ALJ did not err in discrediting the claimant's symptom
10   testimony based on her lack of cooperation during consultative examination in support of
11   his adverse credibility determination).  Plaintiff's refusal to participate in an examination
12   by a state agency physician is a legally sufficient reason for discounting her credibility.

13                    **7.      Inconsistency with Medical Record**

14          The ALJ also rejected Plaintiff's subjective complaints of "debilitating neck, hip,
15   and back pain, with chronic pain throughout her body," because the "record fails to
16   demonstrate the presence of any pathological clinical signs, significant medical findings,
17   or any neurologic abnormalities that would establish the existence of a pattern of pain of
18   such severity as to prevent the claimant from engaging in any work on a sustained basis."
19   (Tr. 35.)

20          The ALJ noted although Plaintiff testified that she could not work because of
21   back, neck, and hip pain, the medical record showed objective findings that were mild.
22   (Tr. 35.)  Specifically, the ALJ noted that objective studies in October 2010 showed
23   "only <u>mild</u> osteoarthritis of the hips bilaterally; right convex thoracolumbar scoliosis,
24   with <u>mild</u> associated multilevel degenerative disk and facet disease . . . with no evidence
25   of positional instability."  (Tr. 35 (citing Admin. Hrg. Ex. 15F at 2-3)) (emphasis in
26   orginial).  He also noted that "[a] September 2009 MRI of the cervical spine revealed
27   mild-to-moderate bony narrowing of the left and right neurofomina at LS-S, with facet
28   arthrosis at C5-C6 and C6-C7, and <u>mild</u> bony narrowing of the left and right neurofomina

1  at L5-S, with mild central canal stenosis at L4-L5."  (Tr. 35) (citing Admin. Hrg. Ex. 23F

2  at 2-4)) (emphasis in original).  The ALJ also noted that a "sonogram of [Plaintiff's]

3  knees showed no evidence of abnormality demonstrated in the right popliteal fossa."

4  (Tr. 35 (citing Admin. Hrg. Ex. 27F at 36).)

5          In further support of his conclusion that Plaintiff's complaints of disabling neck,

6  hip and back pain were inconsistent with the objective medical records, the ALJ cited

7  evidence that Plaintiff had a "normal gait and station, with complaints of joint

8  pain/stiffness, no weakness or cramping, no gait disturbance, dizziness, or syncope,

9  decreased range of motion in all joints, with normal tone and muscle mass."  (Tr. 35

10 (citing Admin. Hrg. Exs. 7F, 11F, 16F).)   He further noted that a recent physical

11 examination indicated that Plaintiff had a limited range of motion, left negative straight-

12 leg raising and positive right straight-leg test; right hip tender to palpitation; diminished

13 sensation to light touch of the lower extremity; 5/5 strength, and unsteady gait.  (Tr. 35

14 (citing Admin. Hrg. Ex. 28F).)  In addressing Plaintiff's claims of limitations related to

15 her fibromyalgia, the ALJ noted that although Plaintiff had been assessed with

16 fibromyalgia, she testified that she has been assessed with fibromyalgia for "a long time"

17 and the records showed no evidence of worsening or significant deterioration of that

18 condition.  (Tr. 35.)

19         Plaintiff contends that the ALJ erred by discounting her credibility on the ground

20 that her allegations of pain were not supported by the objective medical record.  (Doc. 21

21 at 31.)   "[A]fter a claimant produces objective medical evidence of an underlying

22 impairment, an ALJ may not reject a claimant's subjective complaints based solely on a

23 lack of medical evidence to fully corroborate the alleged severity of pain."  *Burch*, 400

24 F.3d at 680.   "Although lack of medical evidence cannot form the sole basis for

25 discounting pain testimony, it is a factor that the ALJ can consider in his credibility

26 analysis."   *Id.* at 681.  Generally, noting a conflict between a claimant's subjective

27 complaints and the objective medical evidence in the record constitutes a specific and

28 substantial reason for an ALJ to find that claimant not credible.  *See Morgan v. Comm'r*,

169 F.3d 595, 600 (9th Cir. 1999) ("Citing the conflict between [the claimant's] testimony of subjective complaints and the objective medical evidence in the record, and noting the ALJ's personal observations, the ALJ provided specific and substantial reasons that undermined [the claimant's] credibility.").

Here, as set forth above, the ALJ cited more than a scintilla of evidence to support his finding that Plaintiff's testimony regarding her debilitating pain was inconsistent with the objective medical evidence as a whole. *See Ryan*, 528 F.3d at 1198 (substantial evidence is more than a scintilla and less than a preponderance). Additionally, the ALJ did not discredit Plaintiff's subjective complaints solely on the basis of a lack of supporting objective medical evidence. Rather, he provided additional clear and convincing reasons for concluding that Plaintiff's subjective complaints were not wholly credible including that she continued to seek employment after the disability onset date, treatment and medication effectively controlled her symptoms, and that Plaintiff refused to participate in a state-agency requested physical examination to assess her physical limitations related to her application for disability benefits.

### 8. Sufficient Reasons Support the ALJ's Credibility Determination

Although the Court does not accept all of the reasons the ALJ cited to support of his adverse credibility determination, the ALJ provided sufficient legally adequate reasons that are supported by substantial evidence in support of his credibility determination and, therefore, the Court affirms that determination. *See Batson*, 359 F.3d at 1197 (stating that the court may affirm an ALJ's overall credibility conclusion even when not all of the ALJ's reasons are upheld); *Tonapetyan*, 242 F.3d at 1148 (stating that "[e]ven if we discount some of the ALJ's observations of [the claimant's] inconsistent statements and behavior . . . we are still left with substantial evidence to support the ALJ's credibility determination.").

/ / /

/ / /

/ / /

1
2

**VII. Plaintiff Claims the ALJ Erred in the Weight Assigned to Medical Source Opinions**

3
4
5
6
7
8
9
10
11
12
13
14

Plaintiff also argues that the ALJ erred in weighing the medical opinion evidence. In weighing medical source evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight is given to a treating physician's opinion. *Id*. The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

15
16
17
18
19
20
21
22
23
24

Opinions from non-examining medical sources are entitled to less weight than treating or examining physicians. *Lester*, 81 F.3d at 831. Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

25

**A. Weight Assigned Dr. Sturdivant's November 2010 Assessments**

26
27
28

The ALJ assigned "little to no weight" to treating physician Dr. Sturdivant's opinions on fibromyalgia and the pain questionnaires she completed in November 2010 (the 2010 assessments). (Tr. 36.) The November 2010 assessments rated Plaintiff's pain

1    as "moderately severe" to "severe" (Tr. 476, 478), and her fatigue as "moderately

2    severe." (Tr. 476.) Dr. Sturdivant opined that Plaintiff experienced pain and fatigue to

3    such a degree that those conditions would "frequently" interfere with her "attention, and

4    concentration," "persistence or pace," and would render her incapable of sustaining work

5    on a regular and continuing basis. (Tr. 476-77, 479.) The ALJ rejected Dr. Sturdivant's

6    opinions on the 2010 assessments as inconsistent with her treatment notes, "specifically

7    the physical examination of the claimant conducted on the same day the forms were

8    completed."[4] (Tr. 36.) The ALJ also stated that in November 10, 2010 treatment note,

9    Dr. Sturdivant indicated that she completed the 2010 assessments by interviewing

10   Plaintiff, "suggesting that the doctor apparently relied quite heavily on the subjective

11   report of symptoms and limitations provided by the claimant, and seemed to uncritically

12   accept as true most, if not all, of what the claimant reported." (Tr. 36.) Plaintiff contends

13   that the ALJ's reasons for rejecting Dr. Sturdivant's November 2010 assessments are

14   legally insufficient because they do not constitute either "clear and convincing" or

15   "specific and legitimate" reasons for discounting her opinion.[5] (Doc. 21 at 17.)

16   / / /

17   / / /

18   _____

19   [4] In her opening brief, Plaintiff states that this reason is based on "the inaccurate

20   premise" that Dr. Sturdivant "conducted a physical examination the day of the November 2011 assessments." (Doc. 21 at 19.) Plaintiff's reference to 2011, rather than 2010, appears to be a typographical error. Additionally, as Plaintiff notes in her Reply, the

21   record reflects that Dr. Sturdivant did examine Plaintiff on November 10, 2010, the date she completed the fibromyalgia and pain RFC questionnaires. (Tr. 468-71, 475-79.)

22

23   [5] Dr. Sturdivant completed a fibromyalgia RFC questionnaire and a pain RFC questionnaire on November 10, 2010 (the 2010 assessments). (Tr. 475-44, 478-79.) She

24   completed a fatigue RFC questionnaire in September 2011 (the 2011 assessment). (Tr. 497-98). Although the ALJ gave little weight to the 2010 and the 2011 assessments, he discussed the weight he assigned to each assessment in separate paragraphs of his

25   opinion. (Tr. 36.) Plaintiff argues that the ALJ erred in rejecting Dr. Sturdivant's "assessments" (Doc. 21 at 19, 21), however she only challenges the reasons the ALJ

26   provided for rejecting the November 2010 assessments. (Doc. 21 at 19-21.) Accordingly, Plaintiff has not shown that the ALJ failed to provide legally sufficient

27   reasons for assigning little weight to Dr. Sturdivant's September 2011 fatigue assessment. Moreover, the ALJ gave essentially the same reasons for rejecting the September 2011

28   fatigue assessment as he gave for rejecting the November 2010 assessments. As discussed in Section VII.A, those reasons are legally sufficient.

1          **1.      Opinions not Supported by Treatment Notes**

2          As discussed below, the ALJ did not err in rejecting Dr. Sturdivant's November

3   10, 2010 assessments as not supported by her treatment notes, particularly the treatment

4   notes from November 10, 2010, the date she completed those assessments.   *See Batson v.*

5   *Comm'r of Soc. Sec. Admin*., 359 F.3d 1190, 1195 (9th Cir. 2004) (stating that an ALJ

6   "need not accept the opinion of any physician, including a treating physician, if that

7   opinion is brief, conclusory, and inadequately supported by clinical findings").

8   Additionally, substantial evidence in the record supports this finding.

9          First, a November 10, 2010 treatment note indicates that Plaintiff complained of

10  "chronic pain," but described the purpose of Plaintiff's visit that day as completing

11  disability forms (the 2010 assessments).   (Tr. 465.)   Dr. Sturdivant indicated that she

12  completed the 2010 assessments "by interviewing [the] patient."   (Tr. 466.)   A different

13  treatment note, also dated November 10, 2010, indicates that Plaintiff reported "no joint

14  pain, stiffness, swelling, or redness," "no muscle weakness or cramping," "no gait

15  disturbance," and "no fatigue."   (Tr. 469.)   On examination, Dr. Sturdivant noted "no

16  joint/muscle tenderness or erythema, full [range of motion] of all joint," and "normal

17  [muscle] tone and mass."  (Tr. 470.)

18         As the ALJ found, these November 10, 2010 treatment notes, particularly

19  Dr. Sturdivant's treatment note indicating that Plaintiff did not report or exhibit pain or

20  fatigue, do not support Dr. Sturdivant's opinions on the 2010 assessments of moderately

21  severe to severe pain, and moderately-severe fatigue that would preclude work on a

22  regular and continuous basis.   The ALJ reasonably concluded that the notes did not

23  support Dr. Sturdivant's findings on the 2010 assessments.

24         Second, Dr. Sturdivant's treatment notes rarely indicate the degree of Plaintiff's

25  fatigue or pain.  Specifically, treatments notes from visits with Plaintiff on June 3, 2010

26  (Tr. 424-27), and November 1, 2010 (Tr. 468-471), either do not mention pain or indicate

27  that Plaintiff had no pain.   Other treatment notes indicate that Plaintiff had pain relief

28  from "epidurals, chiro[tractic care], and p[hysical] t[herapy]." (Tr. 428.)  Although some

of Dr. Sturdivant's treatment notes refer to pain, with the exception of a treatment note completed by a registered nurse at Dr. Sturdivant's office indicating that Plaintiff had "increased pain" (Tr. 472), those notes do not indicate the degree of Plaintiff's pain. (Tr. 428-29, back pain and pain with standing; Tr. 465, "chronic pain".)   Similarly, Dr. Sturdivant's treatment notes, including the November 10, 2010 notes, do not specify the frequency or severity of Plaintiff's fatigue, other than a single notation that her fatigue had "increased."   (Tr. 425, "increased fatigue"; Tr. 428-31, no mention of fatigue; Tr. 464-67, no mention of fatigue; Tr. 468-71 "no fatigue"; Tr. 472-74 "fatigue.")

Third, treatment notes from Dr. Sturdivant's office that post-date the November 2010 assessments either do not mention pain or fatigue, or do not describe the frequency or severity of those symptoms.   (Tr. 432-37, no mention of pain or fatigue; Tr. 537-40 "neck pain," but no mention of fatigue; Tr. 541-544 no mention of fatigue, no mention of pain other than "tender lateral hip and posterial cervical area"; Tr. 545-48, no mention of pain or fatigue; Tr. 549-552, no mention of pain or fatigue; Tr. 553-55, Plaintiff had a headache that she "thought was neck pain.")[6]

In summary, the ALJ's determination that Dr. Sturdivant's November 2010 assessments were not supported by her treatment notes is a clear and convincing reasonssfor rejecting her opinions and substantial evidence in the record supports that determination.

## 2.      Opinions Based on Subjective Complaints

Plaintiff further argues that the ALJ erred in discounting Dr. Sturdivant's opinions on the November 2010 assessments on the ground that they appeared to be based mainly on Plaintiff's subjective complaints.  (Doc. 21 at 20, Tr. 36.)  The ALJ did not err in this regard.  As the ALJ noted, Dr. Sturdivant specifically stated that she completed the November 10, 2010 assessments by interviewing Plaintiff.  (Tr. 466.)   Thus, the ALJ

---

[6]  Dr. Matthew Cockett prepared the reatment notes at Tr. 537-40, registered nurse Carol Eldridge completed the treatment notes at Tr. 553-55, and Dr. Sturdivant prepared the other notes cited.

1   reasonably assumed that she based her assessments largely on Plaintiff's subjective

2   complaints.

3       Because the ALJ properly discredited Plaintiff's subjective complaints as

4   discussed in Section VI.B(1)-(8), the ALJ did not err in rejecting Dr. Sturdivant's

5   opinions on the ground that they were based on Plaintiff's self-reported symptoms.  *See*

6   *Bray v. Comm'r Soc. Sec.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (stating that the ALJ

7   properly discounts a physician's opinion that is based solely upon claimant's self-

8   reporting if the ALJ concludes that the claimant's self-reporting is not credible);

9   *Tommasetti*, 533 F.3d at 1041 (9th Cir. 2008) (an ALJ may reject a physician's opinion

10  predicated upon reports of a claimant found not credible); *Thomas*, 278 F.3d at 957

11  (affirming rejection of physician's opinion because it was based on claimant's subjective

12  complaints, not on new objective findings); *Tonapetyan*, 242 F.3d at 1149 (stating that

13  "because the present record supports the ALJ in discounting [the claimant's]

14  credibility, . . . he was free to disregard Dr. Ngaw's opinion, which was premised on her

15  subjective complaints.").

16          **B.     Weight the ALJ Assigned the Reviewing Physicians' Opinions**

17      Plaintiff also argues that the ALJ erred in relying on the opinions of the reviewing

18  state agency physicians in support of his RFC and disability determinations.  (Doc. 21 at

19  21.)   The ALJ stated that he assigned "greater weight" to the opinions of the state

20  agency's reviewing physicians regarding "[Plaintiff's] residual functional

21  capacity . . . because they were not inconsistent with the greater objective record,

22  particularly regarding the finding that the claimant has no significant limitations

23  precluding all work, even taking into account the problems with her fibromyalgia,

24  degenerative disc disease, and pain."  (Tr. 37 (citing Admin. Hrg. Exs. 2A and 4A).)

25          **1.     Dr. Kattapong's Opinion**

26      On initial consideration of Plaintiff's application for disability benefits, reviewing

27  physician Dr. Kattapong concluded that the record contained insufficient information to

28  assess the severity of Plaintiff's physical conditions.  (Tr. 84-87.)   In support of that

1   conclusion, she cited Plaintiff's refusal to undergo a consultative physical examination.

2   (Tr. 82, 87, 96.)   Plaintiff argues that the ALJ erred in relying on Dr. Kattapong's

3   "opinion" because she did not offer an opinion about Plaintiff's physical capacities, but

4   only concluded that there was insufficient evidence to assess Plaintiff's physical

5   capacities.   (Doc. 21 at 21.)   The Court agrees that Dr. Kattapong's opinion does not

6   constitute substantial evidence to support the ALJ's RFC and disability determination

7   because she did not offer any opinions regarding Plaintiff's physical functional abilities.

8   However, to the extent that ALJ erred in relying on her opinion, any error is harmless

9   because there is other substantial evidence in the record to support the ALJ's RFC and

10   disability determinations.

11   **2.      Dr. Griffith's Opinion**

12   On January 3, 2011, on reconsideration of Plaintiff's application for disability

13   benefits, Dr. Griffith opined that Plaintiff could perform light work with some postural

14   limitations.   (Tr. 97-99.)   Specifically, he concluded that Plaintiff could stand or walk for

15   six hours in an eight-hour workday, sit for more than six hours in an eight-hour work day,

16   occasionally lift twenty pounds, frequently lift ten pounds, frequently climb ramps or

17   stairs, frequently balance and kneel, occasionally climb ladders, ropes or scaffolds,

18   occasionally crouch, stoop or crawl, and frequently reach overhead.   (Tr. 97-99.)   He also

19   found that Plaintiff should avoid concentrated exposure to hazards.   (*Id.*)

20   The ALJ assigned "greater weight" to Dr. Griffith's opinion because it was "not

21   inconsistent with the greater objective record, particularly regarding the finding that

22   [Plaintiff] has no significant limitations precluding all work, even taking into account the

23   problems with her fibromyalgia, degenerative disc disease, and pain." (Tr. 37.)   The ALJ

24   also stated that Dr. Griffith's opinion was "based on the objective findings, progress

25   notes and treatment notes, [and] was generally consistent with . . . the overall medical

26   record as a whole."  (*Id.*)

27   Plaintiff contends that the ALJ erred in relying on Dr. Griffith's opinion because it

28   was accompanied by "scant explanation that failed to consider or mischaracterized

evidence of [Plaintiff's] disabling impairments" and, therefore, did not meet "agency standards."  (Doc. 21 at 22.)   In support of that assertion, Plaintiff cites Dr. Griffith's statement that "no records" confirmed Plaintiff's history of fibromyalgia.  (*Id.* (citing Tr. 98, 344, 347).)  As Plaintiff notes, the record before Dr. Griffith included Dr. Smith's assessment that Plaintiff was positive for eighteen of eighteen fibromyalgia trigger points. (Tr. 93, listing Valley Arthritis Care records among those received by the Agency; Tr. 344-347, Dr. Smith's Sept. 4, 2009 assessment of eighteen of eighteen fibromyalgia trigger points.)

Although Dr. Griffith erroneously stated that the record did not confirm Plaintiff's diagnosis of fibromyalgia, the error did not preclude the ALJ from considering Dr. Griffith's opinion.  The ALJ stated that Dr. Griffith's opinion was "generally consistent with the overall medical evidence," suggesting that the ALJ considered Dr. Griffith's opinion in the context of the entire medical record and did not accept that opinion wholesale.  Additionally, Plaintiff testified during the administrative hearing that her pain from her fibromyalgia and her degenerative disc condition were "all together," and Dr. Griffith considered other evidence of Plaintiff's reported chronic neck and back pain.  (Tr. 79-81, listing evidence received by the Agency; Tr. 98.)

Plaintiff also contends that Dr. Griffith's statement that, "[r]adiological studies show *mild* deg. changes at 1 level of C spine and similar changes at 1 level of L spine along [with] scoliosis of *mild* degree" misstates the medical record.  (Doc. 21 at 22 (citing Tr. 98) (emphasis added).)   In support of that assertion, Plaintiff refers to a September 2009 MRI that revealed disc dessication throughout the cervical spine and disc bulges and facet arthropathy at multiple levels (Tr. 499-500), a September 2009 lumbar MRI that showed disc dessication and facet arthrosis throughout the lumbar spine and severe disc space collapse of the lumbosacral spine (Tr. 501-02), and a March 2011 cervical CT scan that showed *moderately severe* disc dessication at multiple levels, compatible with muscle spasms, and *moderate to moderately severe* foraminal narrowing and disc protrusion.  (Tr. 518) (emphasis added.); (Doc. 21 at 22.)

1    Dr. Griffith accurately described radiological reports indicating that Plaintiff had

2    mild scoliosis and mild degenerative disk disease at one level of her lumbar spine.

3    (Tr. 458, finding that Plaintiff had "right convex thoracolumbar scoliosis, with mild

4    associated multileveled degenerative disk and facet disease, most pronounced at L5-S1.")

5    It appears that Dr. Griffith's description of the degenerative changes in Plaintiff's

6    cervical spine as "mild," was not entirely accurate because a March 2011 CT scan

7    described "moderately severe disc dessication" and "moderate to moderately severe

8    foraminal narrow at disc protrusion in Plaintiff's cervical spine."   However, because

9    Dr. Griffith's opinion of Plaintiff's RFC was not based solely on the radiological reports,

10   but was also based on his review of the all of the evidence that was before the Agency

11   (Tr. 90-94), any error in his description of those radiological reports does not undermine

12   his opinion.

13   Additionally, the ALJ did not assess Dr. Griffith's opinion in isolation.  Rather, in

14   determining that his opinion was entitled to "greater weight," the ALJ found that it was

15   supported by the "objective findings, progress notes and treating notes," and was

16   "generally consistent" with the record as a whole.   (*Id.*)   As discussed below,

17   Dr. Griffith's opinion was consistent with the record evidence and constituted substantial

18   evidence upon which the ALJ could rely in making his disability determination.  *See*

19   *Thomas*, 278 at 957 ("The opinions of non-treating or non-examining physicians may

20   also serve as substantial evidence when the opinions are consistent with independent

21   clinical findings or other evidence in the record.").

22   As discussed in Section VII.A(1), although some treatment notes from

23   Dr. Sturdivant's office refer to pain and fatigue, they rarely indicate the frequency or

24   severity of those symptoms.   Additionally, as discussed in Section VI.B(4), treatment

25   notes in the medical record indicates that Plaintiff's treatment was successful and her

26   condition improved with medication (Tr. 34 (ALJ noted Plaintiff's the effectiveness of

27   Plaintiff's medications and treatment); *Warre*, 439 F.3d at 1006 ("[i]mpairments that can

28   be controlled effectively with medication are not disabling").   Plaintiff reported to her

1    treatment providers that over-the-counter medication, ice, heat, and home exercise helped

2    her pain.  (Tr. 302 (March 2008), 286-88 (April 2008), 342, 345 (September 2009); 439-

3    40 (June 2010).)   Plaintiff also reported that steroid injections relieved her back pain.

4    (Tr. 297 (March 2008); 459 (Oct. 22, 2010); 578-82 (July 2011).)   Thus, although

5    Plaintiff reported that she could not tolerate prescribed medications due to side effects

6    (Tr. 342, 573-76, 578-82, 464-71), it appears that her symptoms were manageable even

7    without the medication often prescribed for her condition.

8        Additionally, as the ALJ noted (Tr. 35-36), objective studies of Plaintiff's back

9    and hips indicated that those condition were mild or moderate, particularly by 2010.

10   (Tr. 499-502 (2009 MRIs show degenerative disc disease but no severe findings); 462

11   (treatment note stating 2009 MRI showed mild findings); 457 (2010 x-ray of hips

12   showing "mild osteoarthritis of the hips bilaterally"); 458 (2010 x-ray of the lumbar spine

13   showing "mild associated multilevel degenerative disk and facet disease").)   Although

14   Plaintiff was diagnosed with fibromyalgia (Tr. 342), and made ongoing complaints

15   related to back pain, her physical examinations over the years did not exhibit significant

16   findings, rather, treatment providers mainly noted decreased range of motion and muscle

17   tenderness or spasms.  (Tr. 286-87 (April 2008); 305 (January 2009); 307 (April 2009);

18   439 (June 2010); 459-62 (October 2010); 469 (November 2010); 578-82 (July 2011).)

19       Although the record also includes evidence indicating that Plaintiff sometimes

20   reported the severity of her pain (Tr. 305, "pain is around a 5 to 6"; Tr. 439, describing

21   low back pain as "sharp"; Tr.459, "pain 8/10 in severity"; Tr. 579 leg, arm, neck and

22   back pain ranging from 3 to 9 out of 10), the ALJ is responsible for resolving ambiguities

23   and conflicts in the record.  *See Andrews*, 53 F.3d at 1039).  "When the evidence before

24   the ALJ is subject to more than one rational interpretation, [the court] must defer to the

25   ALJ's conclusion."  *Batson*, 359 F.3d at 1198 (9th Cir. 2004).  In summary, there is

26   substantial evidence in the record to support the ALJ's RFC and disability

27   determinations.

28   / / /

**VIII.  Conclusion**

As set forth above, the ALJ provided legally sufficient reasons for discounting Plaintiff's credibility and appropriately weighed the medical opinion evidence.   The ALJ's opinion is supported by substantial evidence in the record and any legal errors are harmless.

Accordingly,

**IT IS ORDERED** that the Commissioner's disability determination in this case is **AFFIRMED**.   The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff and to terminate this action.

Dated this 9th day of May, 2014.

Bridget S. Bade
United States Magistrate Judge